FIRST NATIONAL BANK OF MINNE-
APOLIS, Plaintiff and Appellant,

v.

KEHN RANCH, INC., Ed Kehn, Maxine
Kehn (deceased), Clark Kehn, Bonnie
L. Kehn, and Collateral Control Corpo-
ration, a Delaware Corporation, De-
fendants,

and

Touche Ross & Co., a partnership,
Defendant and Appellee,

and

KEHN RANCH, INC., Ed Kehn, Maxine
Kehn (deceased), Clark Kehn, Bonnie
L. Kehn, and Collateral Control Corpo-
ration, a Delaware Corporation, Third-
Party Plaintiffs,

v.

MILBANK MUTUAL INSURANCE COM-
PANY, a South Dakota Insurance Com-
pany, Third-Party Defendants.

FIRST NATIONAL BANK OF MINNE-
APOLIS, Plaintiff and Appellee,

v.

KEHN RANCH, INC., Ed Kehn, Maxine
Kehn (deceased), Clark Kehn, Bonnie L.
Kehn, and Collateral Control Corpora-
tion, a Delaware Corporation, Defend-
ants and Appellants,

and

Touche Ross & Co., a
partnership, Defendant,

and

KEHN RANCH, INC., Ed Kehn, Maxine
Kehn (deceased), Clark Kehn, Bonnie
L. Kehn, and Collateral Control Corpo-
ration, a Delaware Corporation, Third-
Party Plaintiffs and Appellants,

v.

MILBANK MUTUAL INSURANCE COM-
PANY, a South Dakota Insurance Com-
pany, Third-Party Defendants and Ap-
pellee.

FIRST NATIONAL BANK OF MINNE-
APOLIS, Plaintiff and Appellee,

v.

KEHN RANCH, INC., Ed Kehn, Maxine
Kehn (deceased), Clark Kehn, Bonnie
L. Kehn and Collateral Control Corpo-
ration, a Delaware Corporation, De-
fendants,

and

Touche Ross & Co., a
partnership, Defendants,

and

KEHN RANCH, INC., Ed Kehn, Maxine
Kehn (deceased), Clark Kehn, Bonnie
L. Kehn, and Collateral Control Corpo-
ration, a Delaware Corporation, Third-
Party Plaintiffs and Appellants.

v.

MILBANK MUTUAL INSURANCE COM-
PANY, a South Dakota Insurance Com-
pany, Third-Party Defendants and Ap-
pellee.

Nos. 15041–15043.

Supreme Court of South Dakota.

Oct. 1, 1986.

Rehearing Denied Nov. 6, 1986.

Edward M. Glennon, Richard Ihrig, and Laurence R. Waldoch of Lindquist & Vennum, Minneapolis, Minn., for First Nat. Bank of Minneapolis; Robert C. Riter of Riter, Mayer, Hofer & Riter, Pierre, on the brief.

Kehn Ranch, Inc., Ed Kehn, Bonnie L. Kehn, and Clark Kehn, pro se.

Craig W. Gagnon, Darwin J. Lookingbill and Michael J. Bleck of Oppenheimer, Wolff, Foster, Shepard & Donnelly, Minneapolis, Minn., and Charles M. Thompson of May, Adam, Gerdes & Thompson, Pierre, for Touche Ross & Co.

Joe A. Walters, David Kantor, Donald S. Arbour, Robert A. Brunig and Margaret Van Volkenburg of O'Connor & Hannan, Minneapolis, Minn., and James P. Hurley and Mark F. Marshall of Bangs, McCullen, Butler, Foye & Simmons, Rapid City, for Collateral Control Corp.

Lawrence T. Hoffman, Richard B. Allyn and Sandra L. Wallace of Robins, Zelle, Larson & Kaplan, Minneapolis, Minn., and Duncan, Olinger, Srstka, Lovald & Robbennolt, Pierre, for Milbank Ins. Co.

FOSHEIM, Justice.

Appeals #15041, #15042, and #15043 raise issues which stem from a common factual setting and were litigated in a single trial. #15041 is the appeal of First National Bank of Minneapolis (Bank) from a dismissal of its suit against Touche Ross and Company (Touche Ross). #15042 is the appeal of Kehn Ranch, Inc. (Kehn Ranch or the Ranch) and members of the Kehn family from judgments based on the jury verdicts in favor of Bank and Milbank Mutual Insurance Co. (Milbank). #15043 is the appeal of Collateral Control Corp. (Collateral Control) from the dismissal of its suit against Milbank.

Although these appeals were not formally consolidated, they were argued together before this court. In the interest of clarity and to avoid repetition of facts, they are reviewed and resolved in this single decision. We affirm in part, reverse in part, and remand.

## FACTS

Kehn Ranch is a South Dakota corporation owned by Clark Kehn, Bonnie Kehn, and Edwin Kehn (the Kehns). The Ranch conducted a cattle ranching operation on

15,000 acres in Gregory County and other leased land in South Dakota counties. In March of 1978, Bank approved a $5,000,000 seasonal line of credit for the Ranch. The loan was secured by the cattle, feed, crops, and equipment of the Ranch; Bank also received the personal guarantees of the Kehns. As required by the loan agreement, the Ranch retained Touche Ross, a certified public accounting firm, to audit the Ranch's financial statements, and Collateral Control, a Minnesota company, to provide a field warehousing operation. Milbank insured the Ranch under a policy which covered the Ranch against cattle theft.

Kehn Ranch records reveal that the Ranch owned more than 7,000 head of cattle at the time of the loan. According to other records, the Ranch purchased approximately 10,300 cattle and sold approximately 7,100 head during 1978; in addition, numerous calves were born. Financial statements audited by Touche Ross, dated September 30, 1978, show the Ranch then owned over 15,000 head of cattle.

In 1979, Bank extended further credit to the Ranch, and the Ranch's total indebtedness late that year exceeded $9,500,000. According to its internal records, the Ranch owned over 21,000 head of cattle as of July 6, 1979. Financial statements audited by Touche Ross showed the Ranch owning approximately 20,000 head of cattle as of September 30, 1979.

In January of 1980, Bank requested that Collateral Control conduct an inventory of the Ranch. That inventory revealed about 4,000 head of cattle. According to Bank, Kehn Ranch should have then owned 16,000. Because of this 12,000 head shortfall, Bank demanded payment of all loans, took control of the Ranch, and sold the existing collateral. Shortly after Bank's discovery of the shortage, the Kehns notified Milbank of the loss and claimed the cattle had been stolen. Milbank denied the theft claim.

Early in 1982, Bank sued the Ranch and the individual Kehns for fraud and on the promissory notes and personal guarantees.

Bank also sued Touche Ross and Collateral Control, alleging negligence and fraud. The Ranch and Collateral Control sued Milbank on the insurance contract, joining the insurer as a third-party defendant. Kehn Ranch filed for bankruptcy shortly after Bank initiated its suit, but in June of 1982, the Kehns entered into a stipulation with Bank requesting the bankruptcy court to lift the automatic stay of state court proceedings. The stay was lifted and the case went to trial.

The jury returned verdicts for Bank and against Kehn Ranch and the individual Kehns in the amount of $7,222,530 each. An additional $100,000 punitive damages were assessed against Clark Kehn. The trial court added an award to Bank of $6,244,245.10 in interest on the unpaid promissory notes and $252,502.03 in interest from the date of the verdict to the date of the judgment. In addition, the trial court awarded costs of $204,007.38 and attorney's fees of $1,000,000 to Bank and against the Ranch, Clark Kehn, and Bonnie Kehn. The jury awarded the Ranch $300,000 for Bank's failure to liquidate the collateral in a commercially reasonable manner. The trial court offset this award to the Ranch against the amount awarded to Bank.

The jury, finding no theft of the missing cattle, determined that Kehn Ranch and Collateral Control should receive nothing from Milbank. The trial court thereafter dismissed their suit as frivolous. On Milbank's motion, the trial court ordered the Kehns, the Ranch, and Collateral Control to pay Milbank $500,000 in attorney's fees and $40,686.77 in costs.

In Bank's suit against Touche Ross, the jury returned a verdict finding that Touche Ross negligently caused damage to Bank. However, the jury determined that Bank should receive no damages from Touche Ross.

### APPEAL # 15042

#### I.

The first issue raised by the Kehns in appeal # 15042 is whether Bank should be

barred from obtaining a deficiency judgment due to its failure to give notice to the Kehns of the sale of collateral. Two days after Bank took control of the Kehn Ranch, the Kehns signed a document granting Bank the right to take possession of, and sell, all the cattle, feed, and other personal property of the Kehns in which Bank had a security interest. In the same document, the Kehns waived their right to receive prior notice of any sale of collateral by Bank. Bank proceeded to sell the cattle at auction, but did not notify the Kehns of the sale. After the collateral was sold, Bank initiated this lawsuit to recover the deficiency. Bank's failure to give notice to the Kehns became an issue at trial. The jury found that Bank had failed to give reasonable notice of the sale of collateral to the Kehns. Despite this finding, the jury awarded Bank the deficiency judgment of $7,220,530 (excluding interest), as above stated. The Kehns maintain that Bank's failure to give notice should bar the award of this deficiency judgment. We disagree.

Article 9 of the UCC authorizes a creditor to create a security interest in the personal property of the debtor. SDCL ch. 57A-9. SDCL 57A-9-504 states that after a default by the debtor, the secured party may sell or dispose of the collateral in any commercially reasonable manner. The creditor must send notice to the debtor of the sale of collateral unless the collateral is perishable, threatens to decline speedily in value, or is of a type customarily sold on a recognized market. SDCL 57A-9-504(3). Bank argues that a cattle auction is a sale on a recognized market, thereby eliminating the requirement that notice be sent to the Kehns.

■ Under the UCC, a recognized market is one in which sales involve many items so similar that individual differences are non-existent or immaterial, where haggling and competitive bidding are not primary factors in each sale, and where prices paid in actual sales of comparable property are currently available by quotation. *Norton v. National Bank of Commerce of Pine Bluff*, 240 Ark. 143, 398 S.W.2d 538

(1966); *1st Charter Lease Co. v. McAl, Inc.*, 679 P.2d 114 (Colo.Ct.App.1984). Clearly, the New York Stock Exchange and the bond and commodity markets are recognized markets under the UCC. *Fletcher v. Cobuzzi*, 499 F.Supp. 694 (W.D.Pa.1980); *Marine Midland Bank-Rochester v. Vaeth*, 88 Misc.2d 657, 388 N.Y.S.2d 548 (1976); J. White and R. Summers, Uniform Commercial Code § 26-10 (2d ed. 1980). On the other hand, courts have ruled that the following items are not sold on recognized markets: used cars, *Community Manage. Ass'n of Colorado Sp. v. Tously*, 32 Colo.App. 33, 505 P.2d 1314 (1973); *Federal Deposit Ins. Corp. v. Farrar*, 231 N.W.2d 602 (Iowa 1975); computer hardware, *1st Charter Lease Co.*, supra; Indian jewelry, *Gibson v. Hagberg*, 11 U.C.C. Rep.Serv. 655 (N.M.Dist.Ct.1972); household appliances, *In re Bro Cliff, Inc.*, 8 U.C.C.Rep.Serv. 1144 (W.D.Mich.1971); and boats with motors and trailers. *In re Bishop*, 11 U.C.C.Rep.Serv. 1071 (W.D.Va.1972), *aff'd* 482 F.2d 381 (4th Cir.1973).

■ The question of whether cattle fall within the category of collateral customarily sold on a recognized market is marginal. Two jurisdictions have held that cattle are not sold on a recognized market. *Wippert v. Blackfeet Tribe*, 695 P.2d 461 (Mont. 1985); *State Bank of Towner v. Hanson*, 302 N.W.2d 760 (N.D.1981). However, in a recent decision dealing with the notice requirement of SDCL 57A-9-504, the Federal District Court for South Dakota refused to apply the rule set forth in *State Bank of Towner* and *Wippert*. In *Arcoren v. Peters*, 627 F.Supp. 1513 (D.S.D.1986), the defendants (FmHA officials) repossessed the plaintiff's cattle and sold them without giving notice to the plaintiff. The plaintiff argued that the FmHA, which had a security interest in the cattle, violated his right to notice under SDCL 57A-9-504(3), and he cited *State Bank of Towner* and *Wippert* as authority. The federal court rejected the plaintiff's contention, partly because the North Dakota and Montana cases were decided after the plaintiff's cause of action arose. But the court went further and

stated, "In addition, two state court cases, from states other than South Dakota, can hardly be said to 'clearly establish' the law applicable here. Defendants therefore violated no 'clearly established' statutory rights of the plaintiff." *Arcoren,* 627 F.Supp. at 1519. It is apparent that the federal court declined to embrace the rationale of *State Bank of Towner* and *Wippert.*

We agree with the position of the federal court. Admittedly, the cattle market is not identical to the New York Stock Exchange or the bond markets. But like the stock exchange, prices paid for cattle are available by quotation on a daily basis, as are prices paid for shares on the NYSE. Furthermore, when the Bank took possession of the security, cattle were being traded daily on the commodity futures markets, similar to grain and other commodities. Under such a marketing system there is no room for bidding on individual cattle, and "[t]he forces of supply and demand determine price and the valuation of goods...." J. White & R. Summers, *Uniform Commercial Code* § 26–10, at 1111 (2d ed. 1980) (defining a recognized market; note that the commentators regard the commodity markets as "recognized markets"). To claim otherwise would seemingly deny the obvious. We accordingly conclude that commercial cattle herds raised for sale at public livestock markets are collateral "of a type customarily sold on a recognized market" for purposes of SDCL 57A–9–504(3).[1] It follows that under the given facts, the Bank was not required to send notice to the Kehns of the sale of the cattle. In view of this conclusion we need not consider whether the Kehns effectively waived notice of the sale of collateral.

## II.

The second set of issues raised by the Kehns deals with the trial court's jurisdiction in light of the separate bankruptcy proceeding in this case. Kehn Ranch and

the individual Kehns filed for bankruptcy on May 11, 1982. As stated in the facts above, the bankruptcy court lifted the automatic stay and allowed the trial to proceed in state court. At the conclusion of the trial, the trial court awarded accrued interest of $6,244,245.10 to the Bank; it also ruled that the $300,000 judgment in favor of Kehn Ranch should be offset against the judgment awarded Bank. On appeal, the Kehns argue that any award of interest lies solely within the jurisdiction of the bankruptcy court. The Kehns also claim that the $300,000 judgment in favor of the Ranch must be sent back to the bankruptcy court for disbursement rather than be offset against the judgment awarded Bank. Finally, the Kehns argue that if there is an offset of $300,000, it should apply to them individually as well as to the Ranch.

Under the federal bankruptcy code, a petition for bankruptcy operates as an automatic stay, applicable to all other judicial proceedings against the debtor commenced prior to the bankruptcy petition. 11 U.S.C. § 362 (1982). Despite this rule, the automatic stay can be waived by a stipulation of the parties. *In re Herrera,* 23 B.R. 796 (9th Cir.1982); *In re Sando,* 30 B.R. 474 (E.D.Pa.1983). Furthermore, an order of the bankruptcy court lifting the stay returns the parties to the legal relationships that existed before the stay, thereby allowing other courts to exercise concurrent jurisdiction with the bankruptcy court. *Matter of Winslow,* 39 B.R. 869 (N.D.Ga.1984); *Matter of Ricks,* 26 B.R. 134 (D.Idaho 1983).

In the present case, the record clearly indicates that the Kehns stipulated to a waiver of the stay; and as stated, the bankruptcy court lifted the stay to allow this state court action by the Bank. Therefore, the trial court had concurrent jurisdiction with the bankruptcy court when it awarded the approximately $6,000,000 in interest to the Bank. The Kehns cite no bankruptcy code provision which prevents

---

1. This does not include sales of purebred livestock where the pedigree of the individual animal is a price factor.

a creditor from obtaining interest once the stay is lifted and the matter is adjudicated in a state court. Nor are we aware of any such prohibition concerning the set-off of the $300,000 judgment awarded to Kehn Ranch. The bankruptcy code states that creditors will be allowed to offset mutual debts between the parties which arose before the bankruptcy case began. 11 U.S.C. § 553 (1982). The allowance of a set-off recognizes the injustice resulting from compelling a creditor to pay the bankrupt estate the full value of a claim owed, while at the same time requiring the creditor to forfeit a claim due from the debtor. *United States v. Brunner*, 282 F.2d 535 (10th Cir.1960); *Krajci v. Mt. Vernon Consumer Discount Co.*, 16 B.R. 464 (E.D.Pa.1981). Consequently, the Kehns' argument that there should be no offset is without merit.

■ The Kehns are correct, however, in arguing that the $300,000 offset should apply to them individually as well as to the Ranch. Kehn Ranch was principally liable for the loans made by the Bank, while the individual Kehns were guarantors. It is well-settled that the liability of a guarantor cannot exceed that of the principal. *International Multifoods Corp. v. Mardian*, 379 N.W.2d 840 (S.D.1985); *Richter v. Industrial Finance Company, Inc.*, 88 S.D. 466, 221 N.W.2d 31 (1974). The acceptance by the creditor of anything in partial satisfaction of an obligation reduces the obligation of the guarantor in the same measure as that of the principal. SDCL 56-1-25; 38 C.J.S. Guaranty § 77 (1943). Therefore, since the Ranch's obligation to the Bank was reduced by $300,000, the individual obligations of the Kehns must be likewise mitigated. We remand on this issue and direct the trial court to modify the judgment accordingly.

### III.

■ During trial, the Kehns alleged that the nearly 12,000 missing cattle had been stolen and that Milbank, as the insurer, was liable for the loss. The jury rejected the theft claims and found that the Kehns could not recover from Milbank. The trial court then dismissed the theft claim as frivolous and awarded $500,000 in attorney's fees and $40,686.77 in costs to Milbank under SDCL 15-17-35. That statute, adopted in 1984, provides:

> If a cause of action against any person is dismissed, and the court determines that the cause of action was frivolous or brought for malicious purposes, the court may order the plaintiff to pay any or all costs incurred by the person in defending the cause of action, including reasonable attorney's fees.

The Kehns argue that these awards are improper because SDCL 15-17-35 cannot be retroactively applied to cases which arose prior to the date of its enactment. We agree.

It is settled law in this state that a statute will not operate retroactively unless the legislative act clearly expresses an intent that it so operate. *Matter of Adams*, 329 N.W.2d 882 (S.D.1983); *State ex rel. Van Emmerik v. Janklow*, 304 N.W.2d 700 (S.D.1981). Also, under SDCL 2-14-24, no civil action commenced before the present code of laws took effect is affected by its provisions. SDCL 15-17-35 indicates no retroactive intent. *See* 1984 S.D.Sess.Laws ch. 157. Accordingly, we must conclude that the Kehn lawsuit filed against Milbank in 1983 is not affected by a statute subsequently enacted in 1984.

■ Milbank urges this court to apply an exception to the general rule against retroactive application of statutes. *In Brookings County v. Sayre*, 53 S.D. 350, 220 N.W. 918 (1928), we ruled that an amendment to a statute could be retroactively applied because it created no new liability and affected only the remedy. *See also Dakota Central Telephone Co. v. Mitchell Power Co.*, 45 S.D. 462, 188 N.W. 750 (1922).

Milbank's reliance on *Brookings County* is misplaced. The new provision found at SDCL 15-17-35 is not an alteration of present attorney's fees and cost statutes nor is it a substitute for an abuse of process action. The statute created a new and

greater liability for attorney's fees and costs when a frivolous case is dismissed; consequently, it may only be prospectively applied.

We are equally unpersuaded by authority from other jurisdictions cited by Milbank. While some states apparently take a more expansive view with regard to the retroactive application of attorney's fees statutes, we decline to do so under the clear mandate of SDCL 2–14–24 and our prior decisions on the retroactive application of statutes. Moreover, even if doubt about the Legislature's intent arises in cases such as this, "the doubt must be resolved against the retrospective effect and in favor of prospective construction only." *State v. Westling*, 81 S.D. 34, 38, 130 N.W.2d 109, 111 (1964) (quoting 82 C.J.S.Statutes § 414; *see also* cases cited therein). Therefore, we reverse the award of costs and attorney's fees to Milbank under SDCL 15–17–35.

The newly enacted sanction being inapplicable to this action, the trial court should have made any costs and attorney's fees awards under the remaining statutes allocating such expenses. *See* SDCL 15–6–54(d); SDCL ch. 15–17. *See also, City of Aberdeen v. Lutgen*, 273 N.W.2d 183 (S.D. 1979). We therefore remand for calculation of costs under these statutes.

## IV.

After the jury returned its verdict, the Bank filed a motion and memorandum of law requesting the trial court to award prejudgment interest. The trial court granted the motion and ordered Kehn Ranch and the individual Kehns to pay interest in the amount of $6,244,245.10. That award was based upon the interest rate of the notes, calculated from the date of the default to the date of the verdict. The Kehns argue that the award of prejudgment interest was improper because the various claims of liability and the defenses asserted by the different parties precluded any certain calculation of damages owed to the Bank.

 Under SDCL 21–1–11, the prevailing party is entitled to prejudgment interest only if damages are certain or capable of being made certain by calculation. *Hepper v. Triple U Enterprises, Inc.*, 388 N.W.2d 525 (S.D.1986); *Subsurfco, Inc. v. B–Y Water District*, 369 N.W.2d 129 (S.D. 1985). Prejudgment interest is not to be awarded if the damages are uncertain until determined by the trier of fact. *Hanson v. Funk Seeds Intern.*, 373 N.W.2d 30 (S.D. 1985), and cases cited therein; *Arcon Const. Co. v. S.D. Cement Plant*, 349 N.W.2d 407 (S.D.1984).

 Here, the Bank's claim was based upon the promissory notes and the interest rates contained therein. However, the Bank also claimed fraud on the part of the Kehns, and the jury awarded $300,000 to Kehn Ranch because the Bank failed to liquidate the collateral in a commercially reasonable manner. The trial court ordered the amount due the Bank to be offset by any damages due the Kehns. Consequently, the Bank's damages were not certain or capable of being made certain until the jury returned its verdict. Therefore, the Bank was not entitled to recover prejudgment interest, and the trial court erred in awarding prejudgment interest. *See Hepper, supra*, which dealt with the question of prejudgment interest when there has been an offset of damages.

## V.

The Kehns argue that the trial court erred in imposing a post-judgment interest rate of 15%. SDCL 54–3–5.1 and –16 establish the interest rate on judgments at 15%. SDCL 54–3–17 authorizes the Division of Banking and Finance to annually review the current interest rate and, if necessary, to recommend changes in the interest rate to the Legislature. The Kehns claim that SDCL 54–3–17 constitutes an unlawful delegation of legislative powers to the Division of Banking and Finance.

 The South Dakota Constitution states, "The legislative power of the State shall be vested in a Legislature ..." Art. III, § 1. The Legislature cannot abdicate

its essential power to enact policies into law, nor can it delegate such power to any other department or body. However, the Legislature may delegate quasi-legislative powers to an administrative agency for the purpose of carrying legislation into effect. *State v. Smith,* 88 S.D. 76, 216 N.W.2d 149 (1974); *Boe v. Foss,* 76 S.D. 295, 77 N.W.2d 1 (1956). In order for there to be a proper delegation of authority to an administrative agency there must be (1) a clearly expressed legislative will to delegate power, and (2) a sufficient guide or standard to guide the agency. *Matter of Ackerson, Karlen, & Schmitt,* 335 N.W.2d 342 (S.D. 1983); *S.D. Migratory Bird Ass'n v. S.D. Game, Fish and Parks,* 312 N.W.2d 374 (S.D.1981).

■■■ In the present case, the Legislature clearly expressed a will to delegate power to the Division of Banking and Finance under SDCL 54–3–17. Moreover, the Legislature set guidelines for the Division to follow: current interest rates, the rate of inflation, and the prime lending rate. As a result, SDCL 54–3–17 meets the requirements for a proper delegation of authority to an administrative agency. It is also important to note that under SDCL 54–3–17, the Division of Banking only has authority to make recommendations to the Legislature; it has no authority to change existing legislation. Therefore, the statute is constitutionally permissible. *See Hogen v. South Dakota Bd. of Transp.,* 245 N.W.2d 493 (S.D.1976).

■■■ The Kehns also argue that if this Court upholds SDCL 54–3–17, the Court should find that the 15% interest rate is improper and against the intent of the Legislature. We find this argument to be without merit.

### VI.

■■■ Finally, the Kehns raise various other issues in their brief but fail to support them with any authority. Consequently, the issues are deemed waived. SDCL 15–26A–60; *State v. Grooms,* 359 N.W.2d 901 (S.D.1984); *Corbly v. Matheson,* 335 N.W.2d 347 (S.D.1983); *State v. Shull,* 331 N.W.2d 284 (S.D.1983).

### APPEAL # 15041

In appeal # 15041, the Bank disputes a dismissal of its suit against Touche Ross, which had been employed to audit the Ranch financial statements. The Bank alleged that Touche Ross functioned fraudulently or negligently and that as a result, the Bank suffered damages. At trial, Touche Ross argued that it performed professional work and did not intentionally make any false statements, that the Bank did not rely on its audit reports, and that its actions did not contribute to the Bank's loss on the Kehn Ranch loan.

The jury absolved Touche Ross of fraud, but did find the accounting firm negligent. The verdict form apportioned 50% fault to both Bank and Touche Ross; however, the jury indicated that no damages would be awarded to Bank by making a "dash" after the damage question.[2] The jury was then discharged. Because of a claimed inconsistency between the finding of negligence and the denial of damages, Bank moved for a new trial to establish damages. Bank appeals from the denial of that motion. The single issue is whether the verdict finding that Touche Ross negligently caused damage to the Bank, and that Touche Ross was 50% at fault, but which

2. The verdict form reads as follows:
 The *First National Bank of Minneapolis vs. Touche Ross & Co.*
 A. Negligence Claim
 We the jury find
 1. Touche Ross & Co. was negligent.
 (Answer Yes or No). Yes
 2. The negligence of Touche Ross & Co. caused damage to the Bank.
 (Answer Yes or No). Yes

3. Damages
 (a) What percentage of fault do you attribute to each of the following:

 | | |
 |---|---|
 | The First National Bank of Minneapolis | 50% |
 | Touche Ross & Co. | 50% |

 (b) What sum of money will fairly compensate the Bank for the damages caused by the negligence of Touche Ross & Co.? $ —

awards no damages to Bank, is so inconsistent as to require a new trial.

■ Whether a new trial motion is granted or denied is within the discretion of the trial court, and an order denying a new trial will be reversed on appeal only when a clear abuse of that discretion appears. *Cargill, Inc. v. Elliott Farms, Inc.*, 363 N.W.2d 212 (S.D.1985). The record must be viewed in favor of the verdict. *Schaub v. Job*, 335 N.W.2d 568 (S.D.1983). All matters properly and timely presented to the trial court by application for a new trial may be reviewed. SDCL 15–26A–9. *See also* SDCL 15–6–59(a).

■ Initially, we find that Bank's claim has been preserved on appeal. The alleged error in the nature of the jury's response to the damage question on the verdict form was not one so patent, irregular, *and* easily corrected that Bank's failure to object when the verdict was returned precludes appellate review of the claimed error in the verdict. *Fjerstad v. Sioux Valley Hospital*, 291 N.W.2d 786, 788 (S.D.1980). The Bank's claim involves several sub-issues regarding instructions, the verdict form, and the nature of the jury answer. Therefore, the allegation was not about a simple mechanical error that could have been readily returned to the jury for correction.

We also note that the trial court ruled Minnesota law would govern the tort claims in this case. Touche Ross, by failing to file a notice of review, has not preserved the propriety of that decision as an issue on appeal. *In re Application of Trade Development Bank*, 382 N.W.2d 47 (S.D.1986).

■ Bank's strongest argument is that the jury's failure to quantify a damage award prior to apportioning fault is contrary to Minnesota law. Minnesota's comparative fault statute provides:

Contributory fault shall not bar recovery in an action by any person or his legal representative to recover damages for fault resulting in death or in injury to person or property, if the contributory fault was not greater than the fault of the person against whom recovery is sought, but any damages allowed shall be diminished in proportion to the amount of fault attributable to the person recovering. The court may, and when requested by any party shall, direct the jury to find separate special verdicts determining the amount of damages and the percentage of fault attributable to each party; and the court shall then reduce the amount of damages in proportion to the amount of fault attributable to the person recovering.

Minn.Stat. § 604.01(1) (in pertinent part). Bank contends the verdict awarding no damages (indicated on the form by a "dash") is clearly inconsistent with the Minnesota statute.

[T]he jury could have subtracted First Bank's 50% fault from Touche Ross' 50% fault. Because the resulting zero percent when applied against any damage amount would result in no damages, the jury could have mistakenly concluded that First Bank could not recover any damages against Touche Ross, and, therefore, did not answer the question. This mistake is clearly inconsistent with Minn.Stat. § 604.01 which requires the First Bank recover 50% of the damages caused by Touche Ross.

Bank Brief at 11–12. To conclude that a failure to award damages was clearly contrary to law, however, would require this court to find that either the verdict form was fatally defective or that some measure of damages had to be awarded since negligence was established. This we decline to do.

■ First, the lex loci delicti or "place of the wrong" test applied by the trial court governs the *substantive* rights of the parties to a multistate tort action. *Heidemann v. Rohl*, 86 S.D. 250, 194 N.W.2d 164 (1972). That portion of the Minnesota law which directs the trial court to calculate the damages after the jury quantifies and apportions them is procedural only. It is not so intertwined with the substantive provisions that failure to follow it would preclude correct application of

the substantive law. Accordingly, we cannot find the verdict form fatally defective. The jury was properly instructed on the nature of the applicable comparative fault statute and the verdict form did not preclude following those instructions. It is, of course, presumed that the jury understood and abided by these instructions. *Fjerstad, supra,* at 788.

Furthermore, we cannot conclude that a failure to award damages is inconsistent with the finding that Touche Ross negligently damaged Bank. The question of damages is strictly for the trier of fact. *Kent v. Allied Oil & Supply, Inc.,* 264 N.W.2d 512 (S.D.1978); *Kamp Dakota, Inc. v. Salem Lumber Co. Inc.,* 89 S.D. 696, 237 N.W.2d 180 (1975). The jury's verdict will not be set aside except in extreme cases where the jury has palpably mistaken the rules of law by which damages in a particular case are to be measured. *Stoltz v. Stonecypher,* 336 N.W.2d 654, 657 (S.D.1983) (quoting *Simons v. Kidd,* 73 S.D. 306, 311, 42 N.W.2d 307, 311 (1950)). Moreover, the jury was instructed[3] to consider whether Bank's failure to mitigate damages negated any loss caused by Touche Ross. We cannot substitute our judgment for the jury's in denying damages. *See Kamp Dakota, supra.*

We distinguish the facts and circumstances before us from those in *Pexa v. Clark,* 85 S.D. 37, 176 N.W.2d 497 (1970), and *Anderson v. Paulson,* 77 S.D. 583, 96 N.W.2d 305 (1959). In *Pexa,* the jury awarded damages for medical expenses, pain, and suffering caused the decedent, but failed to award any damages for his wrongful death. We reversed for a new trial on the wrongful death theory, concluding that the *undisputed* evidence was sufficient to justify some damages for this action. Here, the jury denied any monetary award to Bank from Touche Ross. Furthermore, the evidence of damages was highly disputed.

In *Anderson,* the jury attempted to award damages to a personal injury plaintiff but declined to find the defendant negligent. Their verdict was accompanied with a note, which read:

"We, the undersigned jurors, do feel that with the evidence and Court's instructions submitted, the defendant, Lee Paulson, was not guilty of negligence. However, this jury feels Julius Anderson, the plaintiff, should receive money in the amount of twenty-five hundred dollars ($2,500.00), cash settlement."

77 S.D. at 584, 96 N.W.2d at 305. This court concluded that the verdict, when considered with the note, did not express an actual and final conclusion and was not clear, certain, and free from ambiguity. Here, we have no indication that the jury did not express a final conclusion by its verdict or that they failed to abide by instructions.

Even though a verdict is susceptible of two constructions, the construction that sustains the verdict must be applied. *Fjerstad, supra; Mid-America Marketing Corp. v. Dakota, Etc.,* 289 N.W.2d 797, 799 (S.D.1980) (and cases cited therein). The mitigation instruction permits a sustainable construction. Accordingly, since we can construe the verdict to mean that the jury found Touche Ross negligent but that no compensable damages were caused, we must do so.

The judgment in appeal #15041 is affirmed.

### APPEAL #15043

We conclude with appeal #15043. At trial, Collateral Control joined the Kehns in alleging that the missing cattle had been stolen and that Milbank, as the insurer, was liable for the theft loss. As it had done with the Kehns, the trial court dismissed Collateral Control's claims and awarded $500,000 in attorney's fees and

---

**3.** Instruction Number 122 provides:

In fixing the amount of money which will reasonably and fairly compensate a party seeking recovery, you are to consider that a person whose property or business is damaged must exercise ordinary care to minimize existing damages and to prevent further damage. If any loss results from a failure to exercise such care, damages cannot be recovered from such loss.

$40,686.77 in costs to Milbank under SDCL 15–17–35. Collateral Control likewise claims these awards are improper because SDCL 15–17–35 cannot be retroactively applied to this case.

We resolved this claim in issue III of appeal # 15042. That resolution is applied here by reference. We accordingly reverse the award of costs and attorney's fees to Milbank under SDCL 15–17–35 and remand for calculation of costs under SDCL 15–6–54(d) and the remaining sections of SDCL ch. 15–17.

## DISPOSITION

The judgment in appeal # 15041 is affirmed. The judgment in appeal # 15042 is affirmed in part, reversed in part, and remanded to the trial court to modify the judgment in accordance with this opinion. The judgment in appeal # 15043 is reversed and remanded for recalculation of costs.

HENDERSON, J., and BRADSHAW, Circuit Judge, concur.

WUEST, C.J., concurs specially.

MORGAN, J., concurs in part, concurs in result in part, and dissents in part.

BRADSHAW, Circuit Judge, sitting for Sabers, J., disqualified.

WUEST, Chief Justice (concurring specially).

I concur, but have some reservations regarding the majority's rationale on the prejudgment interest issue. The Bank sued Kehn Ranch and the Kehns upon two theories: (1) Upon the promissory notes (contract theory); and (2) fraud and deceit. The court instructed the jury upon both theories. The jury was further instructed that if the Ranch and Kehns were liable on the promissory notes the damages was the unpaid principal on the notes and the court would determine interest based on answers to questions on the verdict form, or the applicable law. The court further instructed on damages for fraud. However, it did not instruct the jury that they could award interest on the fraud theory under SDCL 21–1–13, which provides:

In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury.

It appears from the verdict form the jury awarded damages to the Bank and against the Ranch and Kehns on the fraud theory, although the damages against them except for Clark Kehn was the sum of the unpaid principal of the notes. As to Clark Kehn, the jury awarded Bank another $100,000 as punitive damages. Under our law, punitive damages cannot be awarded for recovery on a note, but in the discretion of the jury for fraud. SDCL 21–3–2. Since the jury was never instructed they could award interest on the fraud charge, it was error for the court to grant the motion awarding prejudgment interest. If the verdict had been upon the notes (breach of contract theory), which contained a provision for past due interest, I may have distinguished this case from *Subsurfco* and *Hepper,* although I concurred in both of them.

MORGAN, Justice (concurring in part, concurring in result in part, and dissenting in part).

In appeal # 15041, I concur in the result based on the last proposition only. In appeal # 15042, I concur in the result as to Issue I, dissent as to Issue IV, and concur in Issues II, III, V and VI. In appeal # 15043, I concur.

I take issue with the holding that commercial cattle herds raised for sale at public livestock markets are collateral "of a type customarily sold on a recognized market" for purposes of SDCL 57A–9–504(3), hereafter 9–504(3). The reasoning by which the author arrives at that conclusion is convoluted and internally inconsistent.

The author misapplies Judge Porter's decision in *Arcoren v. Peters,* 627 F.Supp. 1513 (D.S.D.1986). The dispute in that case was whether two FmHA officials enjoyed qualified immunity from suit for damages for selling cattle repossessed under a se-

curity agreement without complying with the notice requirements of 9–504(3). The issue was whether they had violated plaintiff's "clearly established" statutory rights so as to deprive them of immunity. The decision simply held that only two cases, *State Bank of Towner v. Hansen,* 302 N.W.2d 760 (N.D.1981) and *Wippert v. Blackfeet Tribe,* 695 P.2d 461 (Mont.1985), having been decided after the *Arcoren* sale, did not clearly establish applicable law at the time of the sale. The author relies on a conclusory statement taken out of context, while glossing over the true holding in the decision. Judge Porter nowhere suggested that the two decisions were wrong, nor did he cite a single case or secondary authority to the contrary. *Arcoren* may be persuasive with respect to the issue that was before Judge Porter, but it is not applicable in the context of this case.

Rule 9–504(3) exempts collateral "of a type *customarily sold* on a recognized market" from the notice requirement. White and Summers define a recognized market as

arenas of pure competition in the classical sense of the term. The forces of supply and demand determine price and the valuation of goods and such market places are relatively free from human connivance and manipulation.... *Any transaction which involves haggling over price or competitive bidding should not be considered as one conducted on a recognized market,* and the secured party is properly relieved of his obligation to give notice of resale only when neutral market forces rather than negotiations between buyer and seller determine price.

J. White & R. Summers, *Uniform Commercial Code* § 26–10, at 1111 (2d ed.1980) (emphasis added).

There can be no valid argument that under the foregoing text a livestock auction market can possibly qualify as a recognized market. But the majority goes on to compare livestock auction markets to commodities futures markets trading in cattle.

I will concede that they both deal in cattle, but the livestock auction markets deal in cattle on the hoof while the commodities futures markets deal in contracts for future delivery. They are paper transactions. "[L]ess than 3% of all futures contracts culminate in delivery.... Neither the speculative investor nor the person using the futures market as a hedge for his position in the market for the actual commodity generally desires delivery." *Leist v. Simplot,* 638 F.2d 283, 286 n. 2 (2d Cir.1980), *aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982). The argument appears to be that because there are commodities futures markets for cattle, all cattle sales are exempt from the notice requirement. This is a novel theory, but the logical extension of it is that Bank could have just as well gone out and sold the cattle at private sale with impunity. Nor does the majority cite any cases to support it.

The majority goes on to argue that "under such a marketing system there is no room for bidding on individual cattle," which assertion is absolutely inapplicable to livestock auction markets. I suggest that the majority's problem arises from focusing attention on the commodity aspect of the collateral, instead of the marketing system used in the particular sale.

The two cases that the majority rejects are the only cases directly on point dealing with the issue of "recognized markets" in cattle sales. In my view, these two cases correctly state the law with regard to 9–504(3) of the UCC. In addition to White and Summers, many courts and commentators are in accord, and have distinguished sales involving competitive bidding from the "recognized market" called for in 9–504(3). *See, e.g., Norton v. National Bank of Commerce of Pine Bluff,* 240 Ark. 143, 398 S.W.2d 538 (1966); *1st Charter Lease Co. v. McAl, Inc.,* — Colo.App. —, 679 P.2d 114 (1984); *Turk v. St. Petersburg Bank & Trust Co.,* 281 So.2d 534 (Fla.Dist.Ct.App.1973); *Ocean National Bank of Kennebunk v. Odell,* 444 A.2d 422

(Me.1982); *Wippert v. Blackfeet Tribe,* 695 P.2d 461 (Mont.1985); *State Bank of Towner v. Hansen,* 302 N.W.2d 760 (N.D. 1981); *M.P. Crum Co. v. First Southwest Sav. & Loan,* 704 S.W.2d 925 (Tex.Civ.App. 1986); 9 R. Anderson, *Uniform Commercial Code* § 9–504:28–29 (3d ed. 1985); B. Clark, *The Law of Secured Transactions Under the Uniform Commercial Code;* ¶ 4.8[7][f] (1980).

Other cases dealing with auction sales of automobiles lend further support to this notion. It is universally held that an automobile auction is not a "recognized market" under 9–504(3). For citations to over thirty supporting cases, see 9 U.C.C. Case Digest ¶ 9–504.31 (1983, 1986 Cum.Supp.).

That, however, is not the end of the inquiry whether Bank should be denied a deficiency judgment because of the failure to give the notice. Answers to that question vary according to jurisdiction. I will briefly review these varying views.

The provision governing failure to comply with the U.C.C. notice requirements is found at SDCL 57A–9–507(1), hereafter 9–507(1), wherein it states in pertinent part: "If the disposition has occurred the debtor ... has a right to recover from the secured party any loss caused by a failure to comply with the provisions of this part."

One view of this section is that since it does not mention deficiencies, they are not precluded. White and Summers state: "The creditor can surely argue that, since 9–507 is a comprehensive codification of a *debtor's* remedies, and since that section is silent as to denial of a deficiency judgment, such a denial is not a permissible remedy." J. White & R. Summers, *supra,* at 1127. (Emphasis added.) They suggest that under 9–201 the creditor has all the rights that his agreement with the debtor gives him, except when the code specifically provides otherwise. *Id.* Some courts have held that 9–507(1) prescribes the sole penalty for creditor's failure to heed the notice requirements and does not shield the debtor from a deficiency judgment. *See Lincoln Rochester Trust Co. v. Howard,* 75 Misc.2d 181, 347 N.Y.S.2d 306 (City Ct.

1973); *Commercial Credit Corp. v. Wollgast,* 11 Wash.App. 117, 521 P.2d 1191 (1974); *Grant County Tractor Co. v. Nuss,* 6 Wash.App. 866, 496 P.2d 966 (1972).

The anti-deficiency view, on the other hand, is expressed as follows:

[T]o permit recovery by the security holder of a loss in disposing of collateral when no notice has been given, permits a continuation of the evil which the Commercial Code sought to correct. The owner should have an opportunity to bid at the sale.... A security holder who disposes of collateral without notice denies to the debtor his right of redemption which is provided him in Section 9–506. In my view, it must be held that a security holder who sells without notice may not look to the debtor for any loss.

*Skeels v. Universal C.I.T. Credit Corp.,* 222 F.Supp. 696, 702 (W.D.Pa.1963) *vacated on other grounds,* 335 F.2d 846 (3d Cir.1964). *See also Braswell v. American National Bank,* 117 Ga.App. 699, 161 S.E.2d 420 (1968). Another line of anti-deficiency cases hold that strict compliance with the notice requirement is a condition precedent to a claim for a deficiency. *See Leasco Data Process. Equip. Corp. v. Atlas Shirt Co.,* 66 Misc.2d 1089, 323 N.Y. S.2d 13, 9 U.C.C.Rep.Serv. 161 (N.Y.Civ.Ct. 1971).

Lastly, there is an intermediate view, holding that 9–507(1) is not an exclusive remedy, but that 1–103 incorporates prior principles of law and equity which remain effective. This view, termed the Arkansas Rule, indulges a rebuttable presumption that the collateral was worth at least the amount of the debt, thereby shifting to the creditor the burden of proving the amount that would reasonably have been obtained through a sale conducted according to law. *Norton v. National Bank of Commerce of Pine Bluff,* 240 Ark. 143, 398 S.W.2d 538 (1966). For a recent case following *Norton,* see *Farmers & Merchants Bank v. Barnes,* 17 Ark.App. 139, 705 S.W.2d 450 (1986). *See also 1st Charter Lease Co., supra. Accord Weiner v. American Pe-*

*trofina Marketing, Inc.*, 482 So.2d 1362 (Fla.1986). In *Leasing Associates, Inc. v. Slaughter & Son, Inc.*, 450 F.2d 174 (8th Cir.1971), the Eighth Circuit Court of Appeals, in reaffirming the Arkansas Rule, stated it thusly:

> The sanction which makes the [section 9–504(3) notice] requirement viable is a rebuttable presumption that the value of any collateral sold without notice is equal to the debt. Therefore, as a prerequisite to the recovery of a deficiency judgment in Arkansas, the secured party has the burden of proving either the actual value of the collateral at the time of its sale after repossession, or proving that reasonable notice was sent. . . .

*Id.* at 177. For a good discussion of the varying views see *Beneficial Finance Co. of Black Hawk County v. Reed*, 212 N.W.2d 454, 459–61 (Iowa 1973).

I consider the case before us to be a very good argument against the strict anti-deficiency decisions. Kehn signed a written consent to a sale, therefore we can safely assume that they were not deprived of any opportunity to redeem, which some of the "anti" courts stress. Furthermore, it is strikingly obvious that the large deficiency was created by the disappearance of approximately two-thirds of the collateral prior to Bank's repossession and not due to the sale of the remaining collateral. To preclude a deficiency under such circumstances would be a gross miscarriage of justice, there being little if any relationship between the size of the deficiency and the manner of sale.

Nor am I taken with the proposal that 9–507(1) is the debtor's exclusive remedy and he has the burden of establishing, after the fact, what the value of the collateral would have been if the sale had been properly noticed and conducted.

I would opt for the Arkansas Rule. First, there should be a presumption that the value of the collateral equaled the amount due on the principal and interest on the obligation. (This could leave a deficiency for costs of care and preparation and sale expenses, but that would presumably be a minor amount.) Then the burden should rest on the creditor to establish either that he gave reasonable notice or that fair market value was realized from the sale.

Applying the Arkansas Rule to the facts of this sale, I would affirm Bank's right to a deficiency. Kehns made no complaint about the manner of sale, nor do they suggest any improprieties other than the failure to give notice. Bank used regular livestock auction sales to dispose of the collateral. Lacking any specific objections to this manner of sale, I would hold that the evidence showed that Bank realized fair market value for the collateral sold. I would affirm the deficiency judgment.

I dissent from the majority's treatment of Issue IV of case #15042 dealing with prejudgment interest. Furthermore, I disagree with Chief Justice Wuest's concurring analysis. In my opinion, Bank is entitled to the interest as computed by the trial court.

The case was submitted to the jury on two causes of action; a contract action on the promissory note, and a tort action for fraud. The trial court instructed the jury on damages in the contract action thusly:

## No. 123

If you find Kehn Ranch, Inc. is liable to First Bank on the five promissory notes received into evidence, First Bank's damages, for the purposes of your consideration, are equal to the unpaid principal on the notes in the amount of $7,222,-530.00. In this event, the Court will make the calculation of interest based on your answers to questions on the verdict form and/or the applicable law.

## No. 124

If you find Clark Kehn, Bonnie Kehn and Ed Kehn liable to First Bank on their individual guarantees of the promissory notes, First Bank's damages are equal to the unpaid principal on the notes in the amount of $7,222,530.00. In this event, the Court will make the calculation of interest based on your answers to ques-

tions on the verdict form and/or the applicable law.

On the fraud action, the court instructed the jury to calculate damages as follows:

### No. 128

If you find for any party on a fraud or negligence claim, your determination of damages must not be based on speculation or guess. Consequently, the party seeking the damages must prove the amount of the damages suffered as a result of the other party's wrongful conduct. However, the burden on any party seeking to recover damages does not require that person to prove with mathematical precision the exact sum of its damages, but only that it furnish evidence of such facts and circumstances to permit an intelligible and probable estimate of its damages.

The verdict form contained the following interrogatories, which were answered as follows:

#### A. PROMISSORY NOTES AND PERSONAL GUARANTY CLAIMS.

We the jury find:

1. Kehn Ranch, Inc., is liable to the Bank on the unpaid promissory notes.
(Answer Yes or No) Yes

2. Clark Kehn is liable to the Bank on his personal guaranty of the unpaid notes.
(Answer Yes or No) Yes

3. Bonnie L. Kehn is liable to the Bank on her personal guaranty of the unpaid notes.
(Answer Yes or No) Yes

4. Edwin C. Kehn is liable to the Bank on his personal guaranty of the unpaid notes.
(Answer Yes or No) Yes

The verdict also contained interrogatories on the fraud claim as follows:

#### B. FRAUD CLAIM

We the jury find:

Kehn Ranch, Inc.

1. Kehn Ranch, Inc. committed a fraud upon the Bank.
(Answer Yes or No) Yes

2. The fraud of Kehn Ranch, Inc., caused damage to the Bank.
(Answer Yes or No) Yes

3. If your answers to (1) and (2) are "Yes", what sum of money, if any, will fairly compensate the bank for the damages caused by the fraud of Kehn Ranch, Inc.? $7,222,530.00

The same questions were asked regarding the defendants Clark and Bonnie and the jury responded in the same manner. Finally, under a third part of the verdict the jury found that, of the defendants Kehn Ranch, Inc., Clark and Bonnie, Bank was entitled to punitive damages from only Clark and assessed the amount at $100,000.

To begin with, Bank concedes that they cannot collect the $7 million plus dollars verdict more than once. It is obvious, however, that the jury did return a verdict for Bank on the promissory note in accordance with instructions 123 and 124 quoted above. These instructions are the law of the case since they were not challenged on appeal. Bank is therefore entitled to judgment in the sum of $7 million plus dollars, together with interest per the instructions.

Where the majority errs dangerously is in the following reasoning:

> [T]he jury awarded $300,000 to Kehn Ranch because Bank failed to liquidate the collateral in a commercially reasonable manner. The trial court ordered the amount due the Bank to be offset by any damages due the Kehns. Consequently, the Bank's damages were not certain or capable of being made certain until the jury returned its verdict. Therefore, the Bank was not entitled to recover prejudgment interest, and the trial court erred in awarding prejudgment interest.

The majority cites us to *Hepper v. Triple U Enterprises, Inc.*, 388 N.W.2d 525, 531 (S.D.1986), as authority for this holding. Although Justice Fosheim also authored *Hepper*, he fails to note a distinct difference in the posture of the two cases. In *Hepper*, suit was commenced against Triple U for breach of warranty and an unliquidated damage award was made for roughly $286,000. Triple U counterclaimed for the unpaid balance on the contract for sale and was awarded approximately $202,000, which would be liquidated damages. Heppers thus had a balance of $84,000 after the offset. On appeal, Triple U claimed that the trial court should have allowed prejudgment interest on its liqui-

dated damages before the offset. In response, we concluded that since the trial court offset the sums due Triple U by the damages due Heppers, Triple U's damages arising from Heppers' breach of contract were not certain or capable of being made certain until the jury returned its verdict and, therefore, prejudgment interest was properly denied.

There are four different rules that govern the award of prejudgment interest when an offset is also awarded. For an excellent discussion of these four competing rules, see *Socony Mobil Oil Co. v. Klapal,* 205 F.Supp. 388 (D.Neb.1962). The *Hepper* decision apparently follows the "Conversion of Liquidated Claim" Rule: " '[I]n some cases, where a liquidated demand is subject to reduction by virtue of an unliquidated claim, the balance due is deemed to be an unliquidated sum on which interest is not recoverable.' " *Socony Mobil Oil,* 205 F.Supp. at 390 (citing 47 C.J.S., *Interest* § 19, at 32 (1946)). I am unaware of any cases other than *Hepper* that support that rule. Quite to the contrary, the bulk of authority indicates just the opposite.* In *Hepper,* the author never made reference to the rule *per se,* nor did he distinguish the liquidated from the unliquidated damages.

I think that we should abandon the "Conversion of Liquidated Claim" Rule and this case is a prime example why it is totally unsupportable. By virtue of the *Hepper* reasoning, the $300,000 offset given the Kehns barred accrued prejudgment interest of over twenty times that amount. Theoretically, under that rationale, a one-dollar offset awarded to Kehn Ranch would likewise preclude the $6.2 million prejudgment interest award to Bank.

Nor are the cases cited in *Hepper* particularly supportive of the proposition for which they are cited. *Hepper* cites three cases: *Subsurfco, Inc. v. B–Y Water District,* 369 N.W.2d 129 (S.D.1983); *Cargill, Inc. v. Elliott Farms, Inc.,* 363 N.W.2d 212 (S.D.1985); and *Barton Masonry, Inc. v. Varilek,* 375 N.W.2d 200 (S.D.1985). In *Subsurfco, Inc.,* B–Y Water District received a large jury verdict on its counterclaim. B–Y Water District claimed that it was entitled to prejudgment interest on $291,225 of that large jury verdict. Subsurfco, Inc. was awarded $775,789.17 on its original claim which represented the unpaid balance on the contract. We held that B–Y Water District was not entitled to prejudgment interest since the award to Subsurfco, Inc. exceeded the portion of B–Y Water District's award that was entitled to prejudgment interest. While the opinion never discusses whether either claim was for liquidated damages, it is obvious that B–Y's damages were treated as such, otherwise, they would not be entitled to prejudgment interest in any event. Subsurfco's claim for balance due on the contract was clearly liquidated; therefore, we have at best a question of offsetting two claims for liquidated damages, a far different situation than we find in either *Hepper* or the case at hand.

In *Cargill, supra,* the issue was prejudgment interest on the verdict for $166,363 given to Elliott on his counterclaim. The trial court disallowed the interest and we affirmed on the basis that Elliott's damages were not certain or capable of being made certain until the jury rendered its verdict. There was no question of setoff of a counterclaim because Cargill did not receive a verdict on its claim.

---

\* "Ordinarily, where the amount of a demand is sufficiently certain to justify the allowance of interest thereon, the existence of a setoff, counterclaim, or cross claim which is unliquidated will not prevent the recovery of interest on the balance of the demand found due from the time it became due, unless plaintiff's liquidated claim is less than the award to defendant on his counterclaim. If the unliquidated set-off or counterclaim is based on a breach unrelated to the sum due under the primary claim, prejudgment interest is allowed on the entire claim and the amount of the counterclaim or set-off as determined at the trial is then deducted from the total."

47 C.J.S. *Interest & Usury* § 21, at 63 (1982). For a long listing of supporting cases see 47 C.J.S. *Interest & Usury* § 21, at 63 n. 34. Wyoming is in accord. *See Rissler & McMurry Co. v. Atlantic Richfield Co.,* 559 P.2d 25 (Wyo.1977).

Likewise, in *Barton Masonry, supra,* an action on a construction contract, we affirmed allowance of prejudgment interest, but Varilek had no counterclaim for any type of damages.

The second rule, known as the "Interest on the Balance" Rule, is expressed as follows:

'[W]here the amount of a claim under a contract is certain and liquidated, or is ascertainable, but is reduced by reason of the existence of an unliquidated set-off or counterclaim thereto, interest is properly allowed on the balance found to be due, from the time it became due and was demanded, or suit commenced therefor.'

*Socony Mobil Oil,* 205 F.Supp. at 390 (quoting Annot., 89 A.L.R. 678 (1934)). *See Deerhurst Estates v. Meadow Homes, Inc.,* 64 N.J.Super. 134, 165 A.2d 543 (1960).

A third rule denominated "Interest on the Entire Claim" provides substantially that the plaintiff is entitled to interest on the entire amount of his claim for liquidated damages when the counterclaim asserted is not directed at the plaintiff's claim. That is, where the unliquidated set-off or counterclaim is not for defective performance of the liquidated claim upon which suit is brought but arises out of a collateral matter the plaintiff is entitled to interest on the entire amount of his liquidated claim and not on the balance only. *Socony Mobil Oil, supra. See Mall Tool Co. v. Far West Equipment Co.,* 45 Wash.2d 158, 273 P.2d 652 (1954).

Finally, I note the fourth rule denominated as "Counterclaim as a Discount", which appears to have somewhat the same result as the previous rule.

[W]here the plaintiff's demand is liquidated he is given interest on the full amount by treating the defendant's unliquidated demand as a discount and not as a payment. The rule is limited.

'[This] principle, however, appears to be applicable in cases where the claim for deduction could not be said to be demandable at the time when the original liquidated claim became due, but

was rather the proper subject of a counterclaim for damages than of an offset in the nature of a payment.'

*Socony Mobil Oil,* 205 F.Supp. at 392–93 (quoting *Hansen v. Covell,* 218 Cal. 622, 24 P.2d 772, 776 (1933)); Annot., 89 A.L.R. 670, 675 (1933).

I think that our case falls under either of the two immediately preceding rules and I would opt to affirm the trial court's grant of prejudgment interest under either.